UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEILA ANN ANTONNICOLA,

       Plaintiff,                    CIVIL ACTION NO. 09-11425

       v.                               DISTRICT JUDGE BERNARD A. FRIEDMAN

COMMISSIONER OF                  MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

       Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**I.    PROCEDURAL HISTORY**

    *A.    Proceedings in this Court*

On April 16, 2009, Plaintiff filed the instant suit seeking judicial review of the Commissioner's decision disallowing benefits (Dkt. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), this matter was referred to the undersigned for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability insurance and Supplemental Security Income benefits (Dkt. 3, 7). This matter is currently before the Court on cross-motions for summary judgment (Dkt. 13, 14).

    *B.    Administrative Proceedings*

Plaintiff filed the instant claims on October 24, 2005, alleging that she became unable to work on April 16, 2002 (Tr. 64, 121). The claim was initially disapproved by the Commissioner on February 23, 2006 (Tr. 44-48). On February 27, 2006, Plaintiff filed a Request for Reconsideration (Tr. 49, 125) and her claim was again denied on June 8, 2006 (Tr. 50-52).

-1-

Plaintiff requested a hearing and on August 5, 2008, Plaintiff appeared with counsel before Administrative Law Judge (ALJ) James P. Alderisio, who considered the case *de novo*. At the hearing, counsel amended the alleged disability onset date to October 24, 2005 (Tr. 309-310). In a decision dated October 7, 2008, the ALJ found that Plaintiff was not disabled (Tr. 11-20). Plaintiff requested a review of this decision on October 24, 2008 (Tr. 6-7). The ALJ's decision became the final decision of the Commissioner when the Appeals Council, on February 23, 2009, denied Plaintiff's request for further review (Tr. 3); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004).

In light of the entire record in this case, I find that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II. STATEMENT OF FACTS

### A. *ALJ Findings*

Plaintiff was 51 years of age at the time of the most recent administrative hearing (Tr. 13). Plaintiff has past relevant work history as a banquet server (semi-skilled/light), hotel clerk (semi-skilled/light), receptionist (semi-skilled/sedentary), clerk (semi-skilled/light) and teller (unskilled/sedentary to light) (Tr. 13). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since October 24, 2005 (Tr. 13). At step two, the ALJ found that Plaintiff had the following "severe" impairments: degenerative joint disease of the lumbar spine, obesity, bilateral knee pain, tear of the posterior horn of the medial meniscus of the right knee, anxiety disorder

and affective disorder. *Id*. At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations (Tr. 14). Between steps three and four, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform "light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can do no climbing of ramps, stairs, ropes or scaffolding; can do no kneeling or crawling; can do occasional crouching and stooping; and requires work on flat, level ground" (Tr. 15).

In arriving at this RFC, the ALJ gave only limited weight to a Dr. Samuel Goldstein's conclusions concerning Plaintiff's mental state, as the ALJ found that they were not consistent with the medical record and with the psychologist's description of Plaintiff's functional abilities. In addition, the ALJ reasoned that "[i]f the claimant were having the extent of depression or anxiety as alleged, one would reasonably expect the claimant to have stated same to treating sources — even if the treating sources were treating the claimant for other reasons." *Id*. The ALJ also rejected a chiropractor's note, finding that it "lack[s] credibility" and in any case was outweighed by the hospital records, physician reports, and objective medical evidence. *Id.* Furthermore, the ALJ noted that no physician ever indicated that Plaintiff needed to lie down during the day, despite her testimony that she had to. Finally, the ALJ remarked that Plaintiff's failure to "seek examination and treatment and comply with treatment recommendations" reflected that her conditions were not disabling. *Id*.

At step four, the ALJ found that Plaintiff was capable of performing her previous work as a banquet server, hotel clerk, receptionist, clerk and teller (Tr. 19). At step five, the ALJ denied Plaintiff benefits, because the ALJ found that Plaintiff was not under a disability, as defined in the Social Security Act, from October 24, 2005 through the date of the decision (Tr. 19).

**B.    *Medical Records***

Defendant accurately summarized the medical records as follows: Plaintiff visited the emergency room on several occasions because of knee and back pain. On July 20, 2003, she reported back pain made worse by flexion and movement to the left. She reported no radiation of pain, and there was no bladder dysfunction, bowel problems, sensory loss, or motor loss. There was a moderate muscle spasm and moderate soft tissue tenderness; range of motion was normal. Plaintiff was instructed not to lift, bend, sit for prolonged periods, or stoop over the next 2 days, and was discharged (Tr. 172). She was instructed to follow up with her doctor in seven days if not better; there is no record of follow-up (Tr. 173).

The next treatment in the record is a February 5, 2004 emergency room visit for knee pain (Tr. 169). On February 19, 2004, Plaintiff presented with back pain which began the day before (Tr. 160). X-rays revealed mild scoliosis with mild degenerative changes (Tr. 176). She was given a Toradol injection, instructed not to work the current day or the next, and released in "good condition" (Tr. 161). Plaintiff returned to the emergency room on March 12, 2004, with mild spasm, moderate tenderness, and a reduced range of motion. She was diagnosed as having a strained back and was given another Toradol injection. She was also instructed to use ice, avoid strenuous activity, and follow up with her doctor in three days if not better (Tr. 154). Plaintiff underwent a knee X-ray in the emergency room on February 5, 2004, apparently after falling. There was an area of sclerosis present. The interpreting physician noted that it might be benign and recommended follow up "to be certain that this is stable" in three months if pain were present (Tr. 177). Plaintiff improved on Motrin and was discharged. *Id.* Later that month, Dr. A. Fields noted a tender lower spine and diagnosed a strain. He prescribed a corticosteroid (Medrol) and wrote a note for work excusing Plaintiff from work for four days before her visit to

three days after; however, it is not clear whether this was due to a dental infection, back pain, or both (Tr. 276). A month later, he wrote a prescription for fifty tablets of Darvocet-N, which combines the weak opioid propoxyphene with acetaminophen and is used for mild to moderate pain.

Plaintiff visited the ER again in April; a doctor noted mild tenderness and swelling in the knees (Tr. 184). Another X-ray found possible "very early degenerative osteoarthritic changes" (Tr. 181). In June 2005, Plaintiff presented to the emergency room with right knee pain. An exam was unremarkable: no joint effusion, obvious swelling, decrease in range of motion, tenderness, erythema, warmth to touch, or issues with pulses. An X-ray was also negative, and Plaintiff was discharged (Tr. 130). A September 2005 note by a Dr. Vinamo indicated early degenerative joint disease and referred Plaintiff for one visit of home exercise therapy (Tr. 141). Scott Kale, M.D., J.D., M.S., performed a consultative examination on February 1, 2006. He noted full and symmetric peripheral pulses and good range of motion in the cervical spine, shoulders, elbows, wrists, and fingers (Tr. 189). The lumbar spine range of motion was only 70 degrees because of obesity (compared to a normal 90 degrees), while lumbar extension was 25 degrees (compared to a normal 30 degrees). Plaintiff was able to bear weight and had a normal gait. Although her right knee was "mildly tender" and "slightly warmer [than] the left," both had normal range of motion and no apparent swelling or effusion. (Tr. 189). She could walk a line with one foot in front of another (that is, tandem gait), rise from a chair without using her hands, heel-and-toe stand, squat, and ambulate without an assistive device. All neurological signs were normal. A mental status exam was normal, with normal affect and orientation. *Id.* The clinical impression was obesity, osteoarthritis "with subjective complaints of pain related to prolonged weight bearing," and low back strain (Tr. 189-90).

Adopting Dr. Kale's findings, a state agency physician found that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently. She could stand and walk for about six hours and sit for about six hours. Pushing and pulling (apart from lifting and carrying) were unlimited in both arms and legs (Tr. 192). There were no postural, manipulative, visual, communicative, or environmental limitations (Tr. 193-94). State agency psychologist Browyn E. Rains noted no support for a mental impairment as Dr. Kale's mental status examination was "completely normal" (Tr. 211).

On July 28, 2006, Plaintiff saw Win Naing, M.D., who noted knee and ankle tenderness (Tr. 263). X-rays were ordered, but only the left ankle X-ray is in the record. It showed no evidence of osteoarthritis; tiny bilateral spurs were present (Tr. 255). An October 24, 2006 MRI of the right knee found a tear of the medial meniscus and mild to moderate chondrosis (Tr. 242).

Plaintiff was apparently seen for a lower back muscle spasm at Eisenhower Medical Center on February 22, 2007, but only her discharge instructions are in the record (Tr. 285-96). She saw Dr. A. Fields in July 2007, who noted a right knee tear and anxiety, and prescribed Motrin (Tr. 270).

Plaintiff saw a chiropractor, Hassan Reichouni, D.C., on August 29, 2007. He diagnosed "multiple acute traumatic subluxation complexes of the cervical, thoracic, lumbar, and sacroiliac joint," a closed dislocation (location unspecified), "severe limited range of motion," cervical and lumbrosacral myofascitis, and "multiple muscle T.P./ spasms" (Tr. 214) (capital letters removed). The chiropractor indicated treatment three times a week until further notice was necessary, and the Plaintiff "need also continue treatment with her M.D." (*Id.*) He concluded that Plaintiff "need[ed] complete rest." (*Id.*) (capital letters removed). There is no record of further treatment

by the chiropractor between the August 2007 evaluation and the date the narrative was entered into the administrative record (May 13, 2008).

The record contains a note from Dr. Robert Rubin. He notes the Plaintiff has "chronic heel pain (plantar fasciitis) bilateral unresponsive to orthotic control[]" and which "is complicated by obesity and osteoarthritis of her knees bilateral." (Tr. 297) After noting that her prognosis was poor, he wrote "[illegible] — disability —." (*Id.*) On June 4, 2008, Elie Khoury, M.D., completed a return to work form noting bilateral knee arthritis and a degenerated tear in the medial meniscus. The former, she wrote, might require surgery (Tr. 298). A billing record is available but mostly illegible (Tr. 299-301).

Samuel Goldstein, Ph.D., evaluated Plaintiff at the request of her attorney in July 2008 (Tr. 302). He noted four to six months of mental health treatment in 2000 after Plaintiff's divorce, but no current treatment (Tr. 303). Dr. Goldstein observed: "The array of physical problems that this woman presents is really quite monumental." *Id.* Plaintiff reported feeling depressed and unstable (Tr. 304). She was "overly verbal" and "quite self-preoccupied with her pain and other medical difficulties" (Tr. 304-05). Orientation was good, but memory was mixed, with recent recall limited. Dr. Goldstein diagnosed major depressive disorder (with no severity specified), post-traumatic stress disorder, and a mixed personality disorder. He assessed a GAF of 47-50[1] and gave the following prognosis: "Fair at best. The client appears to need fairly

---

[1] The GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

intensive psychological/psychiatric treatment as well as apparently far more medical treatment than she has been able to thus far obtain" (Tr. 306).

### C. *Vocational Expert*

At the hearing, the ALJ gave the vocational expert, Lois Brooks, a list of restrictions: no climbing of stairs, ladders, ropes, and scaffolding, no kneeling, no crawling, occasional crouching or stooping, and no work on non-level ground (Tr. 317). The VE testified that with those restrictions a worker could do various jobs at the light and medium levels of exertion and could also do the teller and receptionist jobs Plaintiff had done in the past (Tr. 317-18). In his decision, the ALJ found a residual functional capacity of light work with the limitations he posed in his question to the vocational expert (Tr. 15). He also found the claimant's statements not credible to the extent they were inconsistent with the medical evidence (Tr. 16). He observed that the doctor's note about heel pain was not entitled to significant weight because "there is nothing in the treatment record that support such limitations" (Tr. 18).

### D. *Plaintiff's Claims of Error*

Although represented by counsel at the ALJ hearing, Plaintiff now appears *pro se* and argues, in a rather conclusory fashion, that the ALJ improperly rejected physician statements and that his decision was not supported by substantial evidence.

## III. DISCUSSION

### A. *Standard of Review*

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *See Sullivan v. Zebley*, 493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency

makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *See Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."). "However, the ALJ is not free to make credibility determinations based

solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only. *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir. 2006).

### B. *Governing Law*

The "[c]laimant bears the burden of proving her entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed.Appx. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq*.) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq*.). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or

-11-

> mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

### C. *Analysis and Conclusions*

Defendant argues that the ALJ's decision is supported by several factors. First, there is a dearth of objective medical evidence suggesting disabling impairments. The record is replete with phrases like "very early degenerative osteoarthritic changes," (Tr. 181), "mild" scoliosis (Tr. 176), and "tiny" spurs (Tr. 255). Defendant avers that the most comprehensive examination, performed by Dr. Kale, showed virtually no abnormalities whatsoever in clinical presentation or in function (Tr. 189). Instead, Plaintiff could perform a variety of tests such as the tandem gait. Plaintiff was also able to perform movements that Dr. Kale found clinically significant — she was able to rise from a chair without using her hands, was able to heel and toe stand, was able to squat down, and did not need an assistive device to ambulate. *Id.* In addition to these objective observations, the treatment given to Plaintiff was consistently conservative. A mild narcotic was prescribed on a few occasions (generally in the emergency room), a steroid injection was performed once, and there was a referral for one visit of home exercise therapy. The regulations specifically state that past treatment is relevant to the disability determination. *See* 20 C.F.R. § 404.1529(c)(3)(V). Defendant states that, if Plaintiff were truly disabled, it is reasonable to expect that she would have sought out — and her doctors would have recommended — increasing levels of treatment. Although Dr. Khoury's note suggests possible future surgery, there is no evidence that this is more than conjecture. Notably, the doctor was not engaging in the moderately aggressive treatment one would expect to see before deciding to proceed with surgery.

Furthermore, Defendant suggests that the only restrictions that any doctor or other acceptable medical source placed on Plaintiff were for one week or less. In many cases, different acceptable medical sources gave inconsistent or even contradictory opinions on the claimant's

physical capabilities. Here, the only developed opinion concerning Plaintiff's abilities is that of Dr. Frank — and the ALJ's residual functional capacity finding is in fact more restrictive than Dr. Frank's conclusions. In sum, Defendant claims that there is no substantial evidence in the record to support a finding of disability, much less evidence which would compel any reasonable ALJ to find the claimant disabled.

Plaintiff argues, in conclusory fashion, that the ALJ gave insufficient weight to her treating physicians. Defendant responds, correctly, that Plaintiff does not identify which records she believes were inappropriately considered, and that none of the sources which might support Plaintiff qualify for the extra weight generally given to treating sources. *See* 20 C.F.R. § 404.1527(d)(2)(i) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source."). Specifically, Defendant avers that the chiropractor, Mr. Reichouni, apparently only saw Plaintiff once and is in any event not an acceptable medical source. *See* 20 C.F.R. § 404.1513(a) (defining acceptable medical source and noting that "medical opinions" must come from acceptable medical sources). Defendant points out that there is only one brief note from Dr. Rubin in the record, and it is not clear whether he had a longitudinal relationship with Plaintiff. Dr. Goldstein evaluated claimant once but provided no treatment or follow-up.

Furthermore, Defendant argues that Mr. Reichouni's conclusions were appropriately rejected because they were cursory and unsupported by medical findings. *See* 20 C.F.R. §§ 404.1528(a) (self-reported symptoms cannot alone establish an impairment), 404.1529(a) (claimant must support allegations by signs or laboratory findings). Defendant points out that there were no X-rays taken or laboratory tests performed and that there is no evidence that

Plaintiff ever followed up with treatment. Additionally, the proposed treatment — visits three times a week — is in any case at serious variance with the limited treatment every other provider recommended or provided. Accordingly, Defendant suggests that the ALJ properly considered the chiropractor's report and gave a reasoned explanation for rejecting it and that the diagnosis of plantar fasciitis is unsupported by signs or laboratory tests. Defendant's arguments are well-taken.

Finally, Defendant avers that the ALJ did not err by giving little weight to the report of Dr. Goldstein, the psychologist who evaluated the claimant at her former attorney's request. The ALJ discussed the report and gave appropriate reasons for rejecting it. Defendant correctly observes that Dr. Goldstein's report of severe symptoms is contradicted by the paucity of mental health complaints in the other medical evidence. The claimant indicated in 2005 on her application for benefits that she had not been seen for emotional or mental problems; she reported to Dr. Goldstein for only four to six months of treatment back in 2000, after her second divorce (Tr. 80, 303). There is a passing mention of anxiety attacks in a 2007 treatment note, but the visit in question focused on musculoskeletal complaints, and the doctor prescribed only Motrin (Tr. 270). As the ALJ noted, it is reasonable to expect that someone with disabling symptoms would have sought out treatment for those symptoms. Instead, she saw Dr. Goldstein less than two weeks before the hearing — and that was by direction from her attorney. There is no evidence of any actual mental health treatment (as opposed to evaluation) in the record, before or after Dr. Goldstein's evaluation. Furthermore, Dr. Goldstein's findings are inconsistent with Dr. Kale's normal mental status exam, which showed normal alertness, orientation, memory, appearance, behavior, attitude, affect, and cognitive abilities (Tr. 189). The state agency psychologist also indicated no evidence of a mental impairment (Tr. 211). Defendant's

arguments are again well-taken, and the undersigned finds no reason to disturb the findings of the ALJ.

In sum, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

### III. RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings and conclusions of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

<pre>
                              S/Mark A. Randon
                              MARK A. RANDON
                              UNITED STATES MAGISTRATE JUDGE
</pre>

Dated: May 6, 2010

### CERTIFICATE OF SERVICE

*I hereby certify that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on May 6, 2010.*

<pre>
                              S/Melody R. Miles
                              Case Manager to Magistrate Judge Mark A. Randon
                              (313) 234-5542
</pre>